CLYDE M. PENLEY v. BETTY ROBERTS PENLEY AND HAMBURG VALLEY, INC.

No. 16A84

(Filed 3 July 1985)

1. **Contracts § 27.1— contract to convey stock in family business—evidence of contract sufficient**

There was sufficient evidence to go to the jury on plaintiff's claim that he was entitled to forty-eight percent of the stock in a Kentucky Fried Chicken business based on an oral contract with his wife where plaintiff had owned a tire business in Weaverville and defendant had worked in a Kentucky Fried Chicken business in Hendersonville; plaintiff had begun operating his tire business during the day and the Kentucky Fried Chicken business at night after his wife became ill; defendant requested that plaintiff come to Hendersonville and run the Kentucky Fried Chicken business after defendant's sister-in-law was no longer with the business; plaintiff did not want to give up his tire business; defendant told plaintiff that the business belonged to them both, that they would share everything they did, and that plaintiff would be a part of the business just as she was; plaintiff then worked eleven to twelve hour days seven days a week in the Kentucky Fried Chicken business, handling social security, unemployment and time sheets while defendant took care of the banking and the bills; plaintiff and defendant discussed how to use money left after bills; and defendant testified in a deposition that plaintiff was not paid a regular salary until they incorporated and that before then they had both simply taken money from the banking account as needed. The business was operated in an informal manner and it would not be unreasonable for the jury to find that defendant had agreed that, if plaintiff would devote his full time to the operation of the business, the business would be operated as a joint enterprise and they would share equally in its assets.

**2. Contracts § 4.1— oral contract between husband and wife to convey stock in business — consideration**

There was consideration for an oral contract between plaintiff husband and defendant wife to split the shares of an incorporated Kentucky Fried Chicken business equally, and the court correctly instructed the jury on consideration, where there were mutual promises to accept division of shares and to continue to operate the business as before, followed by the transfer of jointly owned property to the newly formed corporation. While there was conflicting evidence on whether the parties agreed to and in fact established plaintiff's partial ownership interest both before and after incorporation, and while the jury may have concluded that plaintiff joined the business solely because he was the husband of an ill wife, conflicts in the evidence are to be resolved by the jury. Furthermore, plaintiff's services before incorporation of the business could provide consideration because those services were based on expectations that his contributions would be rewarded by sharing the business equally. G.S. 1A-1, Rule 51.

**3. Limitation of Actions § 4.6— breach of contract to issue stock — accrual of action**

The Court of Appeals erred by ruling that plaintiff's action was barred by the statute of limitations where plaintiff joined his wife in the operation of a Kentucky Fried Chicken business which was later incorporated; the business was operated in an informal manner before and after incorporation, the board of directors never met and stock was never issued; the agreement was to have an equal number of shares issued to plaintiff and defendant; and there was no time limit for its performance. The statute of limitations began to run on the date the contract was breached, not the first date performance was possible; since there was no evidence that defendant refused to issue stock in the corporation prior to April of 1979 when defendant assumed exclusive control over the corporation and its assets, the statute of limitations began to run at that time and plaintiff was within its three year period. G.S. 1-52(1).

**4. Corporations § 16— action to enforce oral contract to issue stock — not stock subscription**

The Court of Appeals erred by concluding that an agreement that plaintiff and defendant would share equally the stock of a Kentucky Fried Chicken business was a stock subscription which was unenforceable under G.S. 55-43 because it was not in writing. This was not an action to enforce plaintiff's promise to take shares; rather plaintiff's action was an attempt to enforce defendant's promise or contract to issue shares to plaintiff.

**5. Corporations § 4.1— agreement to share stock equally — not a stockholder's agreement**

The Court of Appeals erred by considering an agreement that plaintiff and defendant would share equally the shares of a Kentucky Fried Chicken restaurant as a shareholder's agreement which was unenforceable under G.S. 55-73(b) because it was not in writing. G.S. 55-73 was not plaintiff's exclusive legal remedy, and plaintiff properly chose an alternate legal remedy based on defendant's oral contract to convey an interest in the corporation.

6. **Declaratory Judgments § 1— declaratory judgment to enforce oral agreement to issue stock—written agreement not required**

In an action in which plaintiff sought a declaratory judgment that he was the owner of forty-eight percent of the stock and half the assets of a Kentucky Fried Chicken restaurant, the Court of Appeals erred by determining that a declaratory judgment was not appropriate because there was no written instrument to interpret and because such a judgment was not available to determine issues of fact alone. A written agreement is not a requirement under G.S. 1-256 where a judgment or decree will terminate the controversy or remove an uncertainty. G.S. 1-253 *et seq.*, G.S. 1-254, G.S. 1-255, G.S. 1-261.

7. **Contracts § 26— contract between husband and wife to issue stock in corporation equally—evidence of investments and purchasing equipment relevant**

In an action in which plaintiff sought forty-eight percent of the stock in a Kentucky Fried Chicken restaurant operated by his wife, testimony concerning circumstances surrounding the parties' investment of money prior to incorporation and the source of funds used to purchase equipment for the business was relevant because it tended to establish that an agreement between the parties was entered into and as the basis for determining that such an agreement was supported by adequate consideration.

8. **Corporations § 18— agreement to issue stock equally—failure to instruct on requirement for gift—no error**

The trial court did not err by failing to instruct the jury on the requirement of delivery to consummate a gift where plaintiff's action for forty-eight percent of the stock in a Kentucky Fried Chicken business operated by his wife was premised on a contract supported by consideration, defendant's answer did not raise the theory, and defendant did not request a special instruction. G.S. 1A-1, Rule 51(b), Rule 21 of the North Carolina General Rules of Practice for Superior and District Courts.

9. **Appeal and Error § 31.1— instruction on implied contract—no objection at trial**

Defendant was barred from assigning error to the court's instruction on implied contract where she did not object to the instruction at trial. Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure.

10. **Trial § 5— lunch and recess—early resumption without defense counsel—no error**

Defendant did not show prejudice where the court recessed for lunch until 2:15 p.m. but began its charge at 2:00 without defense counsel. Defense counsel returned just after 2:00 p.m. when the court was beginning the introductory parts of its charge, and defendant did not call the matter to the attention of the court or ask for curative instructions.

Justice VAUGHN did not participate in the consideration or decision of this case.

APPEAL by plaintiff, pursuant to G.S. 7A-30(2), from a divided panel of the Court of Appeals, *Penley v. Penley*, 65 N.C. App. 711,

310 S.E. 2d 360 (1984), reversing judgment entered 2 July 1982 in Superior Court, BUNCOMBE County, by *Friday, J.,* following a jury verdict for the plaintiff. Defendant's petition for discretionary review of additional questions pursuant to G.S. 7A-31 was allowed by the Supreme Court 6 March 1984.

    *Carter & Kropelnicki by Steven Kropelnicki, Jr., for plaintiff-appellant.*

    *Elmore & Powell by Bruce A. Elmore, Sr., and Bruce A. Elmore, Jr., for defendant-appellee.*

    FRYE, Justice.

    This case involves a struggle between a Buncombe County couple, now divorced, over the ownership of a Kentucky Fried Chicken business in Hendersonville, North Carolina. The plaintiff-husband claims he is entitled to 48 percent of the business which has now been incorporated. A jury, responding to the only issue placed before them, decided that the plaintiff was indeed entitled to ownership of 48 percent of the stock of the corporate defendant. On appeal by defendant-wife, the Court of Appeals reversed, holding that plaintiff-husband had failed to prove an enforceable agreement. One judge dissented, believing that the evidence was sufficient to support the jury's verdict in favor of plaintiff-husband and that the trial court's judgment should be affirmed. Essentially, we agree with the dissenting opinion.

## FACTS

    Plaintiff instituted this action by the filing of a complaint on 11 August 1981, naming as defendants his wife, Betty Roberts Penley, and the corporate defendant, Hamburg Valley, Inc. Allegations of the complaint were to the effect that the plaintiff and individual defendant were married to each other in 1949 and lived thereafter as man and wife until April 1979, when the individual defendant abandoned the plaintiff. While the plaintiff and individual defendant are citizens of Buncombe County, the corporate defendant is a North Carolina corporation with its principal place of business in Henderson County. According to the complaint, the plaintiff, in late 1967, was operating an automotive tire business in Weaverville, North Carolina, while the individual defendant had an interest in a restaurant, operated as a Kentucky

Fried Chicken franchise, in Hendersonville, North Carolina. During that year defendant-wife became ill and plaintiff, at defendant's request, began spending additional time at defendant's restaurant, in order to assure its continued operation. Subsequently, defendant-wife agreed that if plaintiff would devote his full time to the operation of the restaurant business, the parties would operate that business as a joint enterprise, share equally in the ownership of its assets and divide its returns equally. Thereafter, pursuant to the aforementioned agreement, the parties operated the restaurant "as a joint enterprise, dividing its returns evenly."

Plaintiff further alleged that in late 1977 a corporation was formed pursuant to an earlier oral agreement with defendant, whereby each of the parties was to own forty-eight percent of the shares of stock in the corporation and the parties' son would own four percent of the shares. From late 1977 through 9 April 1979, plaintiff and defendant-wife served as officers and directors of the corporate defendant, both parties devoting substantially all of their efforts to the operation of the corporation's business, receiving equal salaries and benefits as employees and shareholders of the corporation.

The complaint further alleged that defendant-wife abandoned the plaintiff-husband on 9 April 1979 and filed a civil action which she voluntarily dismissed on 2 July 1979 at which time she acknowledged the plaintiff-husband's ownership interest in the corporation and property which had been purchased with the proceeds of the defendant corporation and that the parties would continue to operate the business as in the past. Subsequently, on 31 December 1979, defendant-wife again abandoned the plaintiff and since that time "has wrongfully and intentionally denied the plaintiff any rights" in the corporate defendant, "either as an officer, employee, shareholder, or otherwise" and has "wilfully and wrongfully converted to her own use and benefit" proceeds from the operation of the corporate defendant and has otherwise "so conducted the business and affairs of the [corporate defendant] as to dissipate its assets and render the interest of [plaintiff] in that corporation essentially worthless."

Plaintiff alleged that he was entitled to judgment declaring him the owner of forty-eight percent of the shares of the cor-

porate defendant, to an accounting of the corporate transactions and of the individual defendant's transactions with regard to jointly owned property, to other injunctive relief, and to $250,000 in damages. In addition, he prayed for liquidation of the corporation pursuant to G.S. 55-125(a)(4), or in the alternative, for relief under G.S. 55-125.1, as the court deems appropriate.

Defendants' response was in the form of an answer and counterclaim presenting six defenses. The first defense was failure to state a claim upon which relief could be granted, together with a motion to dismiss pursuant to Rule 12 of the Rules of Civil Procedure. The second defense was a motion for summary judgment pursuant to Rule 56 on the ground that there was no genuine issue as to any material fact. The third defense admitted the residence of the parties, the marriage, plaintiff's interest in the Weaverville Tire Company, defendant's illness and "that she permitted the plaintiff at his request to assist her somewhat in the operation of the [Kentucky Fried Chicken] business." Defendants further admitted the filing of the Articles of Incorporation of the business "on or about the 29th day of December 1978" (sic) and that "from December 28, 1977 until April 9, 1979, both parties received equal salaries as employees of the corporate defendant." Most of the other allegations in the twenty-nine paragraphs of the complaint were denied. Defendants further admitted that defendant-wife filed a civil action in Buncombe County District Court, the reconciliation of the parties and her voluntary dismissal of the action. Defendants also admitted that defendant-wife had control of the corporate books and records of the corporate defendant and further admitted that no dividends were paid to the plaintiff "as he is not a stockholder."

The fourth and fifth defenses were as follows:

FOURTH DEFENSE

That if the Court finds there was any agreement between the Plaintiff and Defendant with regard to the ownership of the corporation which is enforceable at law or that the Plaintiff is otherwise entitled to be declared owner of a portion of the corporate stock, then the Defendants respectfully plead both the three-year and 10-year statutes of limitation in bar of the Plaintiff's claim.

FIFTH DEFENSE

That the Plaintiff has never paid any capital amount into the corporation nor participated in the corporate affairs and has waived any interest which he otherwise might have in the corporation.

With reference to the fourth defense, the parties stipulated that there would be no reliance by defendants on the statute of limitations except insofar as it could have been pled and relied on in a previous case filed by defendant-wife and to which the plaintiff filed his action and counterclaim on 27 March 1981.

The sixth defense and counterclaim alleged that beginning in the early 1970's and continuing until the parties separated on the 2nd day of January 1980, defendant-wife purchased with her sole and individual funds a number of items of real and personal property, including the real property and buildings upon which the Kentucky Fried Chicken franchise is located and others and had record title placed jointly in her name and the name of the plaintiff-husband, although it was never her intention to give the plaintiff a vested ownership interest in the property or to transfer control of the property to him. Defendants prayed that the relief requested by plaintiff be denied and that defendant-wife be named the true and sole owner of the property identified in the counterclaim. Subsequently, defendants were allowed to amend the answer in order to plead the Statute of Frauds.

Plaintiff's evidence consisted of his own testimony and that of his younger brother, Jim Penley; portions of the deposition of defendant-wife from a previous action; and several exhibits, including the Articles of Incorporation of Kentucky Fried Chicken of Hendersonville, Inc., and the amendment changing the name of the corporation to Hamburg Valley, Inc. Plaintiff's motion to amend the complaint to conform to the evidence was allowed without objection. Defendants' motion to dismiss was denied. Defendants then took a voluntary dismissal of their counterclaim, without prejudice.

Defendants' evidence consisted of the testimony of the individual defendant, Betty Penley, and Rebecca Hancock Inders, director of franchising for Kentucky Fried Chicken, and certain exhibits, including the franchise for the Kentucky Fried Chicken

outlet in Hendersonville, North Carolina, which was issued to Betty Penley. Defendants renewed their motion to dismiss, which was denied.

Following jury arguments by counsel for both parties and Judge Friday's charge, the following issue was, by prior stipulation, submitted to the jury: Is the plaintiff entitled to ownership of forty-eight percent of the stock of Hamburg Valley, Inc.? The jury answered the issue "Yes," and the trial court thereafter entered judgment that plaintiff is entitled to ownership of forty-eight percent of the stock of Hamburg Valley, Inc., retaining jurisdiction over the parties and subject matter "for entry of such further orders as may, from time to time, be appropriate."

Defendant-wife appealed to the Court of Appeals, asserting twenty-six assignments of error relating primarily to evidentiary issues, the judge's charge to the jury, and the manner in which the trial was conducted. Assignment Number 10 asserted error in the failure of the trial judge to dismiss plaintiff's case at the conclusion of the plaintiff's evidence and again at the conclusion of all of the evidence on the ground that the plaintiff's evidence and all of the evidence failed to prove and support any legal basis which would support any of the relief sought by the plaintiff. Assignment 26 asserted error in denial of defendants' motions to set aside the "judgment" as being contrary to the weight of the evidence and in the alternative for a new trial on the grounds that the evidence was insufficient to justify the verdict and that the verdict was contrary to law.

The Court of Appeals determined that the jury verdict in favor of plaintiff could be sustained only if "the plaintiff has proved a valid enforceable contract with either of the defendants." That court then held: (1) that the agreement between plaintiff-husband and defendant-wife was a pre-incorporation subscription as defined by G.S. 55-43(a) which was invalid because not in writing, signed by the party to be charged, and delivered by the subscriber as required by G.S. 55-43(b); (2) the agreement was in essence a shareholder's agreement which was unenforceable under G.S. 55-73(b) because not in writing; and (3) any agreement on the part of the husband and wife for the husband to join her in the business was not enforceable under contract law because not supported by valuable consideration, since plaintiff's

interest in the business evolved from his status as a husband, and not as a business partner.

In the alternative, the Court of Appeals held that a declaratory judgment was inapplicable on the record in this case because there was no written instrument to interpret and because the only question involved was one of fact which was decided by the jury. Finally, and again in the alternative, the Court of Appeals' majority held that the action was barred by G.S. 1-52(1), the three-year contract statute of limitations, since plaintiff's cause of action accrued as soon as the corporation was formed and the action was not instituted within the applicable period thereafter. Essentially, the Court of Appeals determined that the trial court erred in denying defendants' motion to dismiss and for judgment notwithstanding the verdict[1] and that under no view of the evidence could judgment in favor of the plaintiff be sustained. Consequently, the judgment of the trial court was reversed. The majority below found it unnecessary to discuss defendant-wife's assignments of error relating to the admission of evidence and the sufficiency of jury instructions.

The dissenting opinion in the Court of Appeals indicated that the parties entered into a partnership agreement prior to the proposed incorporation, that the plaintiff-husband's surrender of his partnership interest constituted valuable consideration for the agreement to split the stock of the corporate defendant, that the agreement was neither a pre-incorporation agreement nor a shareholder's agreement under the Business Corporation Act and that the claim was not barred by the statute of limitations, since the statute would not begin to run until demand had been made for the stock promised.

---

1. The record indicates that defendants' motion at the close of the plaintiff's evidence was "to dismiss Plaintiff's Complaint" rather than for a directed verdict in favor of defendant. At the close of all the evidence, defendants' counsel simply stated: "We would renew our motion, Your Honor."

We also note that there is no assignment of error relating to the trial judge's denial of defendants' motion for judgment notwithstanding the verdict. Assignment Number 26 assigns error to the denial of defendants' motion to set aside the judgment [sic] and for a new trial. A motion to set the *verdict* aside and for a new trial pursuant to Rule 59 is directed to the discretion of the trial judge while a motion for judgment notwithstanding the verdict pursuant to Rule 50 is to be decided as a question of law. *See Bryant v. Nationwide Insurance Co.*, 313 N.C. 362, 329 S.E. 2d 333 (1985).

PLAINTIFF'S APPEAL

A.

CONTRACT LAW

First, we address plaintiff's arguments on appeal. Because plaintiff's appeal is based solely on the existence of a dissent in the Court of Appeals, the scope of our review on plaintiff's appeal is limited to the issues raised in that dissent. N.C. Rules of Appellate Procedure, Rule 16(b) (1985). Additional issues raised by defendant pursuant to her petition for discretionary review will be discussed later in this opinion. The dissent essentially concluded that the resolution of "this case turns on an analysis of simple contract law." *Penley v. Penley*, 65 N.C. App. at 724, 310 S.E. 2d at 368. It is true, in fact, that plaintiff relied primarily on a theory of contract law during the trial of his case, in an effort to support his contentions that a partnership between him and his wife had been created. Therefore, we must determine whether there was sufficient evidence presented by plaintiff to go to the jury on the sole issue presented to it, namely, whether plaintiff was entitled to ownership of forty-eight percent of the stock in Hamburg Valley, Inc., premised on the implicit finding by the jury that a contract between the parties had indeed been created. If plaintiff did present sufficient evidence to go to the jury, then the Court of Appeals incorrectly concluded that the jury verdict for plaintiff must be reversed. Although not precisely identified as such by the Court of Appeals, it appears that the majority of the panel decided that defendant-wife's motion for judgment notwithstanding the verdict should have been granted by the trial judge.

Recently, this Court addressed the proper standards for determining when a judgment notwithstanding the verdict is appropriate. In *Bryant v. Nationwide Fire Insurance Co.*, 313 N.C. 362, 329 S.E. 2d 333 (1985) we stated:

First, such a motion is essentially a renewal of an earlier motion for directed verdict. *Dickinson v. Pake*, 284 N.C. 576, 201 S.E. 2d 897 (1974). Accordingly, if the motion for directed verdict could have been properly granted, then the subsequent motion for judgment notwithstanding the verdict should also be granted. *Manganello v. Permastone, Inc.*, 291 N.C. 666, 231 S.E. 2d 678 (1977) (cited in 90 A.L.R. 3d 525). In

considering any motion for directed verdict, the trial court must review all the evidence that supports the non-movant's claim as being true and that evidence must be considered in the light most favorable to the non-movant, giving to the non-movant the benefit of every reasonable inference that may legitimately be drawn from the evidence with contradictions, conflicts, and inconsistencies being resolved in the non-movant's favor. *Farmer v. Chaney*, 292 N.C. 451, 233 S.E. 2d 582 (1977). This Court has also held that a motion for judgment notwithstanding the verdict is cautiously and sparingly granted. *Investment Properties of Asheville, Inc. v. Allen*, 281 N.C. 174, 188 S.E. 2d 441 (1972), *rev'd on other grounds*, 283 N.C. 277, 196 S.E. 2d 262 (1973). It is also elementary that the movant for a Rule 50(b) motion must make a motion for directed verdict at the close of all the evidence. *Whitaker v. Earnhardt*, 289 N.C. 260, 221 S.E. 2d 316 (1976).

*Id.* at - - -, 329 S.E. 2d at 337-38.

[1] In the instant case, the question then becomes whether there was sufficient evidence, considered in the light most favorable to the plaintiff-husband as non-movant, giving to that evidence the benefit of every reasonable inference that may legitimately be drawn from it, to support a jury verdict in his favor and thus prevent a directed verdict for defendant-wife. Since the parties stipulated that the only issue for the jury to decide was whether plaintiff-husband was entitled to ownership of forty-eight percent of the stock of the corporate defendant, the question presented by the motion for directed verdict was whether there was sufficient evidence presented by both parties, with contradictions, conflicts, and inconsistencies resolved in plaintiff-husband's favor, to permit the jury to answer "yes" to the issue presented.

Plaintiff testified that he went into the tire business in 1965, after going to night school for two years taking an automotive course in order that he could later branch off into automotive work and automotive parts business. He testified that defendant, his wife, started working the same year in the Kentucky Fried Chicken business and that he worked there on the weekends. In 1967, his wife became ill and at her request he began operating the chicken business at night and his tire business during the day. He further testified that in November of 1967, his wife looked at

the books and indicated that they did not have enough money to pay the taxes and bills; that subsequently, after her sister-in-law was no longer with the business, his wife asked him to come to Hendersonville with her and run the business; that he did not want to go because he did not want to give up his tire business but that she finally persuaded him and he gave the tire business to his brother and began working full time with the Kentucky Fried Chicken business. He further testified as follows:

Q. Did you and Mrs. Penley have any more discussions about that before you went?

A. Well, she kept asking me to go — if I'd come with her. If I'd go in with her. She kept asking me. And I kept telling her I didn't want to go. And I don't know how many times she asked me. And I just — I don't know how many times I told her that I did not. Maybe once — that I didn't want to go. Maybe once, or two. But finally she told me that if I'd go that — that — and go in with her that it would belong to both of us. We'd share everything that we did, money, the profits, the business, anything they did, why I'd be part of the business just like she was.

Q. As a result of that, what did you do?

A. I told her I — I told her I still wouldn't — didn't want to go. And she started crying and telling me that it belonged to me as much as it did her. And she wasn't able to do the work and she couldn't do the work, and if I didn't go that she was going to lose it. And that's when I agreed to go. And I wouldn't agree to go until she promised me that — that — that we'd save all that we could if I went.

Plaintiff testified that for a while thereafter he tried working both with the tire business in Weaverville and the restaurant in Hendersonville, but eventually "quit working in the tire business." "After those discussions I started opening and closing in Hendersonville . . . . I worked those 11-12 hour days, seven days a week. On the weekends, it would be more . . . . I took care of the social security and unemployment, the time books. She would take care of the money, the banking and paying the bills. There was money left over after paying the bills, there was money in the business and we would use it to pay the bills. When we got

enough to invest, we would talk about what we would invest in. And we would invest in something . . . ." Plaintiff also testified that part of the money was used to purchase equipment and construct a new building for the business.

Plaintiff's evidence included a portion of the deposition of Mrs. Penley as follows:

Q. All right. When did your husband first start working full time in the Kentucky Fried business?

A. '68.

. . . .

Q. Over what period of time did he continue to work in that business as a full-time proposition, on full-time basis?

A. Up until a year and a half ago.

. . . .

Q. Was he paid a regular salary during that period of time?

A. We both had a checking account, and also we had the Kentucky Fried Chicken, and it was just more or less if you needed money you got it.

Q. You didn't pay any specific salary that was designated as salary, did you?

A. Not until I incorporated.

. . . .

Q. And both of you had access to the funds of the corporation and to the profit of it.

A. Yes, sir.

As the above evidence tends to show, the parties operated this business in an informal manner. Under these circumstances, it would not be unreasonable for the jury, considering the evidence in the light most favorable to the plaintiff, to find that, as alleged in the complaint, defendant-wife "agreed that if plaintiff would devote his full time to the operation of the restaurant business, the parties would operate that business as a joint enter-

prise, share equally in the ownership of its assets, and divide its returns equally." The evidence would also support a jury finding, as alleged in the complaint, that "[t]hereafter, pursuant to the aforementioned agreement, the parties did operate the restaurant as a joint enterprise, dividing its returns evenly." Thus, when the parties discussed incorporating the business in 1977, the jury could reasonably find that they were discussing incorporating a business jointly owned by them. These conclusions could easily support the theory that a contract, oral in nature, had been entered into by the parties.

[2]  The majority in the Court of Appeals further concluded that such an oral contract would fail because it was not supported by valuable consideration and is therefore unenforceable. We disagree. The applicable law is stated in *Helicopter Corp. v. Realty Co.,* 263 N.C. 139, 139 S.E. 2d 362 (1964):

> It may be stated as a general rule that 'consideration' in the sense the term is used in legal parlance, as affecting the enforceability of simple contracts, consists of *some benefit or advantage to the promisor, or some loss or detriment to the promisee.* (Emphasis added.) *Exum v. Lynch,* 188 N.C. 392, 125 S.E. 15; *Cherokee County v. Meroney,* 173 N.C. 653, 92 S.E. 616; *Institute v. Mebane,* 165 N.C. 644, 81 S.E. 1020; *Findly v. Ray,* 50 N.C. 125. It has been held that 'there is consideration if the promisee, in return for the promise, *does anything legal which he is not bound to do,* or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor or not.' 17 C.J.S. 426. *Spencer v. Bynum,* 169 N.C. 119, 85 S.E. 216; *Basketeria Stores v. Indemnity Co.,* 204 N.C. 537, 168 S.E. 822; *Grubb v. Motor Co.,* 209 N.C. 88, 183 S.E. 730; *Stonestreet v. Oil Co.,* 226 N.C. 261, 37 S.E. 2d 676; *Bank v. Harrington,* 205 N.C. 244, 170 S.E. 916.

*Id.* at 147, 139 S.E. 2d at 368. (Emphasis original.)

The court further instructed the jury on the applicable law as follows:

> Now, you will recall that for the plaintiff, ladies and gentlemen, plaintiff has introduced evidence which he contends tends to show . . . that he did go over there and work

full-time, that he worked seven days a week, that he gave up his business in Weaverville in order to operate the Kentucky Fried Chicken store in Hendersonville . . . . And he says and contends that she promised him that he would receive 48 percent of the stock in this corporation, and he says and contends to you that he is entitled to 48 percent of the stock, that it was a family corporation . . . and that she promised him that he would have that much stock . . . .

And he says and contends to you that this promise was supported by valuable consideration, that he gave up his work over in Weaverville and started working over in Hendersonville full-time, that he lost this . . . business had to close over there in Weaverville because he was devoting full-time to the Kentucky Fried Chicken store, that he has worked there, built the business up, and that she promised . . . that he would have this much stock in the corporation as a result of his contribution to it . . . .

. . . .

Now, members of the jury, as the Court mentioned to you earlier, we have been dealing in this case with the law of contracts. Now the question may arise in your minds as to the definition of a contract. A contract, members of the jury, is an agreement between two or more competent parties based upon a sufficient consideration to do or not to do a particular thing, which agreement, if valid, the law will enforce. There is no contract unless the parties assent to the same thing in the same sense at the same time. There is a contract, however, if they do.

A contract is the coming together of two minds on a thing done or to be done. It results from the concurrence of the minds of two or more parties. It is not what either thinks, but what both agree.

Now, members of the jury, a contract in North Carolina may be express or implied. An express contract is one in which terms of the agreement are declared or expressed by the parties, orally or in writing, at the time the contract was entered into. [An implied contract arises when the intention of the parties is not expressed but an agreement in fact

[creating an obligation is implied or presumed from their acts and words, when and where there are circumstances which, according to the ordinary course of dealings and common understanding of men, show a mutual intent to contract.]

Thereafter, the court charged the jury:

Now, members of the jury, the Court instructs you that if you are satisfied [by the greater weight of the evidence] that the plaintiff and defendant did enter into an agreement whereby the plaintiff was supposed to receive 48 percent of the capital stock of this company, if you're satisfied by [the greater weight of the evidence] that this agreement was made, then the Court instructs you that you should answer the issue yes. On the other hand, ladies and gentlemen, if you are not so satisfied, or if you are unable to tell where the truth lies upon the issue, then you should answer that issue no.

We consider these charges to be a correct statement of the applicable law. Furthermore, the trial judge instructed the jury in accordance with G.S. 1A-1, Rule 51, which requires the judge to explain the law and to apply it to the evidence on all substantial features of the case. *Investment Properties v. Norburn*, 281 N.C. 191, 188 S.E. 2d 342 (1972).

What then is the consideration to support the promise, on the part of each of the parties, to split the shares in the incorporated business equally between the two parties—husband and wife? It is their mutual promises to accept the division of shares and to continue to operate the business as before, followed by the transfer of jointly owned property to the newly formed corporation.

Plaintiff testified that they had discussed issuing 24 shares to plaintiff, 24 shares to defendant wife and two shares to the son but the attorney "advised us that it would be 48-48-4." He further testified that there was no change in the percentage of the shares to be received by him after he and his wife had agreed to share the stock equally. While at the attorney's office, plaintiff signed the articles of incorporation after discussing "the laws and the officers of the corporation." These articles listed plaintiff, defend-

ant-wife, and their son as initial directors and incorporators of the corporation.

Plaintiff's evidence included defendant-wife's deposition statement as follows:

Q. So would it be fair to say that you operated as a family business up to that time?

A. Well, it became a corporation, so I don't think that would be family, but it's still family.

Q. It's a family-held corporation, isn't it?

A. That's right.

. . . .

Q. So you both just started operating the business as a family business.

A. Yes. And our son.

We now consider the Court of Appeals' analysis of the evidence in the light of *Leatherman v. Leatherman*, 297 N.C. 618, 256 S.E. 2d 793 (1979), and *Guano Co. v. Colwell*, 177 N.C. 218, 98 S.E. 535 (1919). The Court of Appeals concluded that plaintiff's interest in the restaurant business "evolved from his status as a husband, and not as a business partner." In effect, the court decided that the evidence was insufficient to rebut the presumption that services rendered by plaintiff-husband "in the wife's business" were performed gratuitously and therefore any promise on the part of the wife to issue stock in the corporation to plaintiff was unenforceable because not supported by consideration.

In *Leatherman v. Leatherman*, 297 N.C. 618, 256 S.E. 2d 793 (1979), this Court held that there is a "presumption that services rendered by a wife in her husband's business are gratuitously performed absent a special agreement to the contrary." *Id.* at 622, 256 S.E. 2d at 796. This presumption applies equally to a husband's services in his wife's business. *See Guano Co. v. Colwell*, 177 N.C. 218, 98 S.E. 535 (1919). In *Leatherman*, the Court found no evidence of any special agreement to rebut the presumption but recognized that there could be instances where evidence of an agreement to the contrary would make the services of one spouse to the other's business non-gratuitous.

Assuming, *arguendo*, that the correct rule to be formulated from *Leatherman* and *Guano Co.* is that, absent a contract or special agreement to the contrary, services performed by one spouse in the other spouse's business are presumed to be gratuitously performed, the evidence in the instant case is sufficient for the jury to find a "contract or special agreement to the contrary." The first contract or special agreement was the 1967 agreement that in exchange for plaintiff devoting his full time attention to the Hendersonville restaurant, defendant would share the business, the money, the profits with plaintiff and that "it would belong to both of us." Another contract or special agreement was entered into when the parties agreed to incorporate the business and split the stock "fifty-fifty," later "48-48-4," and continue to operate the restaurant as a family business. While the jury *may* have concluded from plaintiff's evidence that plaintiff joined the business in Hendersonville and worked long hours solely because he was the husband of an ill wife, the jury was not *required* as a matter of law to so find.

Defendant points to conflicting evidence which tends to rebut plaintiff's evidence that the parties agreed to and in fact established plaintiff's partial ownership interest in the business both before and after incorporation. For example, the 1976 tax return for which plaintiff supplied the information designated plaintiff as an employee rather than owner of the business. While this evidence is competent on the question of ownership of the business, it is not conclusive. *See Eggleston v. Eggleston*, 228 N.C. 668, 47 S.E. 2d 243 (1948). The resolution of conflicts in the evidence, the credibility of witnesses, and the weight to be given any evidence is for the jury. *See State Automobile Mutual Ins. Co. v. Smith Dry Cleaners, Inc.*, 285 N.C. 583, 206 S.E. 2d 210 (1974).

The Court of Appeals also stated that plaintiff's past services could not support defendant's subsequent promise to convey the stock to plaintiff. This usual presumption can be rebutted by evidence that the party rendering the services reasonably expected remuneration. Thus, the general rule that prevents past services from supplying the consideration necessary to support a subsequent promise "does not include cases in which the consideration is a legal liability which arose before the promise was made, and upon which the promise is based. Such forms of con-

sideration are sufficient." (Citations omitted.) *Jones v. Winstead*, 186 N.C. 536, 540, 120 S.E. 89, 90-91 (1923).

Plaintiff testified that when he initially decided to render his services to defendant full time, defendant told plaintiff that if he would "go with her that it would belong to both of us" and "I'd be part of the business just like she was." Therefore, the jury could find that plaintiff reasonably premised his decision to render services on a full-time basis on promises made to him by defendant-wife, which led plaintiff to reasonably conclude and expect that his contributions would be rewarded by sharing in the business equally. So plaintiff's past services and forfeiture of his then-existing business could also serve as the consideration necessary to support defendant-wife's later promise to have 48 percent of the shares issued to him. There was also evidence that plaintiff continued to devote his services to the business full time for some period of time after defendant made her alleged promise. Therefore, there was sufficient evidence from which a jury could conclude that the parties had entered into a contract, supported by valuable consideration in the form of services and management either before or after the promise was made. Accordingly, the Court of Appeals erred in holding that the agreement in question was unenforceable because not supported by valuable consideration.

## B.

### STATUTE OF LIMITATIONS

[3]   Plaintiff next argues that the majority of the Court of Appeals panel erroneously held that the statute of limitations would bar plaintiff's action. For the purpose of determining whether the action is barred by the statute of limitations, the parties have stipulated that the governing date is 27 March 1981 rather than 11 August 1981, the date the complaint was filed. Preliminarily, we agree with the court below that the three-year contract limitations period provided in G.S. 1-52(1) is the applicable statute of limitations. However, we disagree with the particular date chosen by the majority for accrual of the action.

In general, an action for breach of contract must be brought within three years from the time of the accrual of the cause of action. G.S. 1-52(1); *Reidsville v. Burton*, 269 N.C. 206, 152 S.E. 2d

147 (1966); *Thurston Motor Lines v. General Motors Corp.*, 258 N.C. 323, 128 S.E. 2d 413 (1962). A cause of action generally accrues and the statute of limitations begins to run as soon as the right to institute and maintain a suit arises. G.S. 1-15(a); *Reidsville v. Burton*, 269 N.C. 206, 152 S.E. 2d 147; *Thurston Motor Lines v. General Motors Corp.*, 258 N.C. 323, 128 S.E. 2d 413; *North Carolina State Ports Authority v. Lloyd A. Fry Roofing Co.*, 32 N.C. App. 400, 232 S.E. 2d 846 (1977), *aff'd*, 294 N.C. 73, 240 S.E. 2d 345 (1978). The statute begins to run on the date the promise is broken. *Pickett v. Rigsee*, 252 N.C. 200, 113 S.E. 2d 323 (1960). A new promise to pay fixes a new date from which the statute runs. *Id.* In no event can a statute of limitation begin to run until plaintiff is entitled to institute action. *Reidsville*, 269 N.C. 206, 152 S.E. 2d 147.

Applying the law to the facts of the instant case, while it may be apparent that the organizational meeting of the initial board of directors *could* have been held on 5 January 1978 and that the board *could* have authorized the issuance of the stock on that date, it was not *required* to do so. In fact, the evidence tends to show that no board of directors ever met, no stock was issued to anyone, and that plaintiff and defendant-wife continued to manage the business in an informal manner after the incorporation. The agreement at issue was an agreement to have an equal number of shares of stock issued to Mr. and Mrs. Penley. This oral contract contained no specific time limit for its performance and certainly there was no breach of the agreement by not issuing the stock on the earliest possible date following the filing of the articles of incorporation. Rather, the breach occurred and the right to institute an action commenced, at the earliest, when defendant broke her promise or took action inconsistent with the promise she made to plaintiff. Action on defendant's part inconsistent with the promise made by her could have manifested itself when defendant refused to issue the stock as agreed or refused to honor plaintiff's demand for issuance of the stock to plaintiff or when defendant prevented plaintiff from jointly participating in the business — all such conduct evidencing an intention not to honor the agreement. There is no evidence that prior to April 1979 defendant refused to issue stock in the corporation as agreed, or that plaintiff made any demand upon his wife for issuance of the stock to him. Since plaintiff and defendant-wife con-

tinued after incorporation to manage the business jointly, without issuing stock to anyone, sharing equally in the proceeds of the business until April 1979 when defendant-wife assumed exclusive control over the corporation and its assets, April 1979 was the earliest date that plaintiff could have instituted an action for breach of the agreement. The statute thus began to run, not from January 1978—the first date when performance of the contract was possible, but from April 1979—the date that the contract was breached by failure to perform when required to do so under the agreement. April 1979 is well within the three-year limitations period ending 27 March 1981. Therefore, plaintiff's action is not barred by the statute of limitations.[2]

## C.

### BUSINESS CORPORATION ACT

Furthermore, plaintiff contends that the majority incorrectly concluded that the Business Corporation Act defeats his claim. We agree with plaintiff.

[4] The Court of Appeals determined that the agreement between plaintiff and defendant was essentially a stock subscription pursuant to G.S. 55-43. Since G.S. 55-43(b) requires such agreements to be in writing, that court concluded that this agreement was unenforceable. We do not agree with the court below that G.S. 55-43 is applicable to the present case. A stock subscription is defined in relevant part in G.S. 55-43(a) as follows:

> A preincorporation subscription is a *promise or contract to take shares* in a corporation to be organized and to pay the agreed price thereof to the corporation or to others for its benefit . . . . (Emphasis added.)

This is not an action in which defendant is trying to enforce plaintiff's *promise to take* shares. Rather, we view plaintiff's present action as an attempt to enforce defendant's *promise or contract to*

---

2. We find it unnecessary to discuss plaintiff's further contention that the action is not barred, since no shares in the subject corporation, Hamburg Valley, Inc., could have been issued until that corporation came into existence in June 1978 when it was created by amending the Articles of Incorporation of Kentucky Fried Chicken of Hendersonville, Inc., the original corporation. The June 1978 date would also be within the three-year statute of limitations period ending 27 March 1981.

*issue* shares to plaintiff, the number of shares to represent a certain percentage of ownership within a corporation to be formed. This seems evident from plaintiff's testimony on direct:

> Q. What did she say to you, Mr. Penley, about the ownership of the stock in that corporation?
>
> A. Well, *she agreed* that we would split it fifty-fifty.
>
> Q. Did you discuss it again with her after that?
>
> A. We talked about it before we went to the attorney's office, and she wanted to give her son a few shares, and I told her it didn't make any difference to me.
>
> Q. How did she want it divided at that time?
>
> A. She wanted it—we were talking in terms of fifty shares and—which would've been twenty-four for her, twenty-four for me, and two for her son.
>
> . . . .
>
> Q. Did Mrs. Penley make any statement to him, to the attorney, in your presence, about *what she wanted done* with the stock?
>
> A. I can't remember what was said.

Defendant-wife testified on direct as follows:

> Q. What, if any, interest was your husband getting out of the corporation?
>
> . . . .
>
> A. Forty-eight percent.
>
> Q. And how much percentage were you getting?
>
> A. Forty-eight percent.
>
> Q. And were you giving any to anybody else?
>
> A. The son three, or four . . . .

This testimony also indicates that plaintiff was endeavoring to enforce defendant's agreement to have issued to him a number of shares representing his ownership interest in the corporation to

be formed. Therefore, we reject the reasoning, analysis, and ultimate conclusion reached. by the Court of Appeals on this particular issue.

[5] The majority in the Court of Appeals also considered the oral agreement between the parties to be a shareholder's agreement, unenforceable because not in writing as required by G.S. 55-73(b). Pigeonholing plaintiff's theory of recovery in such a narrow and inflexible fashion is incorrect in these circumstances. G.S. 55-73(b) provides, *inter alia*, that

> [N]o written agreement to which all of the shareholders have actually assented . . . which relates to any phase of the affairs of the corporation . . . shall be invalid . . . on the ground that it is an attempt by the parties thereto to treat the corporation as if it were a partnership or to arrange their relationships in a manner that would be appropriate only between partners.

Subsection (b), like the other two subsections of G.S. 55-73, simply abrogates, as to agreements within its purview, certain judicial doctrines which had formerly invalidated particular shareholders' agreements on those grounds which this section now disallows. *Blount v. Taft*, 295 N.C. 472, 246 S.E. 2d 763 (1978). While G.S. 55-73 has been referred to as the "heart" of the North Carolina Business Corporation Act with respect to close corporations, *see* Latty, *Close Corporations and the New North Carolina Business Corporation Act*, 34 N.C.L. Rev. 432, at 438-440 (1956), we do not view this statute as plaintiff's exclusive legal remedy. Plaintiff has properly chosen an alternate legal theory, premised primarily on defendant's oral agreement to convey an interest in the corporation—a question of simple contract law. Accordingly, we do not view the parties' agreement as an unenforceable shareholders' agreement.

## D.

### DECLARATORY JUDGMENT

[6] In the prayer of plaintiff's complaint, he requested judgment "declaring plaintiff to be the owner of 48 percent of the shares of stock of Hamburg Valley, Inc., and of one-half of all assets purchased by the parties from the proceeds of that corporation, re-

gardless of record or legal ownership of such property." The Court of Appeals determined that a declaratory judgment was inapplicable on the record in this case because there is no written instrument to interpret and because such a judgment is not available to determine issues of fact alone. G.S. 1-253 provides as follows:

> *Courts of record permitted to enter declaratory judgments of rights, status and other legal relations.*
>
> Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed. *No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for.* The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree. (Emphasis added.)

G.S. 1-254 and G.S. 1-255 provide, in pertinent part, that any person interested under a "written contract," or other instrument or "as or through" a fiduciary or "in the administration" of an estate may obtain a declaration of rights or other legal relations thereunder. G.S. 1-256 then provides:

> *Enumeration of declarations not exclusive.*
>
> The enumeration of G.S. 1-254 and 1-255 does not limit or restrict the exercise of the general powers conferred in G.S. 1-253 in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty.

G.S. 1-261 provides as follows:

> *Jury trial.*
>
> When a proceeding under this Article involves the determination of an issue of fact, such issue may be determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending.

G.S. 1-264 provides:

> *Liberal construction and administration.*

This Article is declared to be remedial, its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and it is to be liberally construed and administered.

A declaratory judgment is not inappropriate in this action. While most of the cases seeking a declaratory judgment involve written agreements, this should not be a requirement where, pursuant to G.S. 1-256, "a judgment or decree will terminate the controversy or remove an uncertainty." Factual questions, pursuant to G.S. 1-261, can be determined by a jury and questions of law determined by the court.

We find nothing in the Uniform Declaratory Judgment Act, G.S. 1-253 *et seq.*, that prohibits plaintiff from proceeding thereunder to have his rights declared as to ownership of stock, if any, in the corporate defendant. We hold that the judgment entered by the trial court declaring the plaintiff to be "entitled to ownership" of 48 percent of the stock of defendant corporation while retaining "jurisdiction over parties and subject matter of this cause for entry of such further orders as may, from time to time, be appropriate" is not invalid on the grounds that a declaratory judgment is inappropriate to this case.

### DEFENDANT'S CROSS-ASSIGNMENTS

We will now consider the issues raised pursuant to defendant's petition for discretionary review.

[7] Defendant brings forward the following assignments of error that were raised but not considered by the Court of Appeals. Defendant's first contention is that the court erred in allowing plaintiff to testify about certain circumstances surrounding the parties' investment of money prior to incorporation and the source of funds used to purchase equipment for the Kentucky Fried Chicken business. No legal authority is cited in support of this argument. Defendant essentially contends that this evidence was irrelevant to "any of the issues and could only have confused the jury." We disagree. "Strictly speaking, evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue." 1 Brandis on North Carolina Evidence § 77, at 285 (1982) (footnote citations omitted). This evidence was relevant to the only issue submitted to the jury because it tended to establish

that an agreement between the parties was entered into and also the basis for determining that such agreement, admittedly oral in nature, was supported by adequate consideration. Proof of the foregoing was relevant to the only material issue to be resolved, namely, whether plaintiff was entitled to ownership of 48 percent of the stock in the corporation to be formed.

[8] Defendant next contends that the court erred in failing to instruct the jury on the requirement of delivery to consummate a gift. As discussed earlier in this opinion, plaintiff's theory was premised on a contract supported by consideration. There is no basis for submitting instructions regarding a gift, as defendant's answer did not raise this theory; and, furthermore, defendant requested no special instruction pursuant to Rule 21 of the North Carolina General Rules of Practice for Superior and District Courts or Rule 51(b) of the North Carolina Rules of Civil Procedure. Under the circumstances, we find no error in the failure of the trial court to instruct on the need for delivery to consummate a gift.

Defendant's third and fourth contentions challenge the sufficiency of the trial court's summary of the evidence and contentions of the defendant. We have reviewed the judge's charges, and we do not find them to be in violation of Rule 51(a) of the North Carolina Rules of Civil Procedure, which provides, *inter alia*, that "the judge shall give equal stress to the contentions of the various parties."

[9] Next, defendant contends that the court erred in instructing the jury on the theory of implied contract when the theory was not supported by the evidence. Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure provides in pertinent part:

(2) *Jury Instructions; Findings and Conclusions of Judge.* No party may assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection; provided, that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

Similarly, Rule 21 of the General Rules of Practice for the Superior and District Courts provides, in pertinent part:

> [A]t the conclusion of the charge and before the jury begins its deliberations, and out of the hearing, or upon request, out of the presence of the jury, counsel shall be given the opportunity to object *on the record* to any portion of the charge, or omission therefrom, stating distinctly that to which he objects and the grounds of his objection. (Emphasis added.)

*See Wall v. Stout*, 310 N.C. 184, 188, --- S.E. 2d ---, --- (1984).

Indeed, in the present case the judge provided the parties with an opportunity to object after he had charged the jury. Defendant, however, failed to object to the instruction on implied contract and therefore Rule 10(b)(2) bars her from assigning error to this portion of the judge's instruction. *See State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983).

[10] Defendant's final contention is that the court erred in beginning the charge to the jury in the absence of defense counsel. Apparently the court began its charge before defense counsel had returned from lunch recess. Defense counsel contends that the court recessed until 2:15 p.m., but the court began its charge at 2:00 o'clock in the presence of plaintiff, defendant and plaintiff's attorneys. Defense counsel returned just after 2:00 p.m. and the court was beginning the introductory parts of its charge. Assuming, *arguendo*, that court had been recessed until 2:15 p.m., counsel failed to call this to the attention of the trial judge or to ask for curative instructions. We do not believe that defendant has shown any prejudice.

## CONCLUSION

Having considered fully the contentions of plaintiff and defendant, and the authorities cited in support thereof, we are convinced that the trial judge correctly entered judgment on the jury verdict in favor of plaintiff. Accordingly, the decision of the Court of Appeals to the contrary is

Reversed.

Justice VAUGHN did not participate in the consideration or decision of this case.